HAGEDORN, J.
*251 ¶ 1 Marcos Rosas Villegas (Villegas)[1] is an illegal immigrant who was brought to the United States from Mexico as a young child. When he was sixteen, he and two others broke into a home brandishing weapons, tied up the occupants, and robbed them. The State filed a delinquency petition charging him with armed robbery party to a crime (PTAC) and three other related offenses. The State also filed, and the court granted, a petition to waive Villegas into adult court. Villegas subsequently pled guilty to armed robbery PTAC.
¶ 2 Villegas sought postconviction relief and was denied. On appeal, he challenges both the juvenile and adult court proceedings. He challenges the juvenile waiver proceedings as both an erroneous exercise of *252 discretion generally, and on the grounds that his counsel provided ineffective assistance. He further maintains that he should be able to withdraw his guilty plea in adult *202 court because the plea colloquy was defective and on the basis that he received ineffective assistance of counsel there as well. His plea withdrawal argument is premised largely on the rationale that his attorney failed to inform him that his plea would render him inadmissible to the United States and ineligible for Deferred Action for Childhood Arrivals (DACA).
¶ 3 We affirm. Villegas has failed to show that the plea colloquy was defective. Villegas' attorney also did not perform deficiently when he failed to counsel Villegas about DACA and correctly warned Villegas that inadmissibility was a likely result of the plea. Because his guilty plea was valid, Villegas' challenges to the juvenile waiver proceedings-neither of which are offered as separate grounds for plea withdrawal-are forfeited under the guilty plea waiver rule.
BACKGROUND
¶ 4 Villegas is an illegal immigrant who was brought to the United States when he was five years old. In November 2012, the State filed a delinquency petition accusing Villegas of armed robbery, burglary, and two counts of false imprisonment. Villegas was sixteen at the time of the alleged conduct. The petition set forth the following.
¶ 5 Villegas and two others knocked on the door of an apartment. When a woman, S.A., answered, they pushed their way into the apartment demanding money and marijuana. Two of the housebreakers *253 wielded knives.[2] Villegas and his cohorts proceeded to restrain S.A. and another woman by duct taping their hands behind their backs and told them to "stay still" or they would "get hurt." During all of this, S.A.'s two young children were home and in the bedroom. One of the occupants of the apartment was apparently in on the plot; he had arrived earlier to "make things look like they were cool." The accomplice was restrained with duct tape as well. Eventually, the assailants left, stealing an unspecified amount of money and a gaming system.
¶ 6 In light of the seriousness of the offense, the State petitioned the juvenile court to waive its jurisdiction, which Villegas' attorney vigorously opposed. Following a hearing, the juvenile court found that retaining jurisdiction was contrary to the best interests of the community and Villegas. Accordingly, it granted the petition, and Villegas was charged as an adult.
¶ 7 Villegas reached an agreement with the State and pled guilty to armed robbery PTAC; the other charges were dismissed and read in at sentencing. Before entering the plea, the circuit court engaged Villegas in a colloquy to ensure he understood the agreement and the rights he was giving up. The court explained that armed robbery was "a very serious felony" and carried a potential punishment of forty years in prison. Although there would be a presentence investigation and a sentencing recommendation, the court warned that it was not bound by that recommendation. Villegas indicated that he understood the nature of the offense, the possible punishment, and that the court was not bound by any sentencing recommendation.
*254 ¶ 8 The court proceeded to outline that Villegas was giving up his right to a trial, including the associated rights of assistance of counsel during the trial, forcing the State to meet its burden of proof, cross-examining the State's witnesses, and calling his own witnesses. Villegas indicated *203 that he understood. The court also asked whether Villegas had any questions about the plea questionnaire, and Villegas indicated he did not. The court then cautioned that "if you are not a citizen of the United States you are advised that a plea of guilty ... may result in your deportation, the exclusion from admission to this country or even denial of naturalization under federal law." The court followed up and asked Villegas if he understood that Immigration and Customs Enforcement "may look into this case"; Villegas indicated he did. Finally, the court asked Villegas if he understood the factual basis for the charge; Villegas said yes. The court did ask two questions concerning the agreement itself that required clarification by Villegas' attorney-Robert Kennedy.
THE COURT: Do you have any plea agreement other than the court will order a presentence investigation-called a PSI-and that both sides would be free to argue. Do you know anything else that you have been offered?
MR. KENNEDY: Your Honor, I don't think he understands you, but in any case the agreement that was just stated today by myself is that, the sole agreement, the only agreement you know of?
THE DEFENDANT: Yes, sir.
THE COURT: When you leave here do you expect that there will be other concessions?
MR. KENNEDY: I don't know if he understands that either. Do you think that they are going to offer or *255 make any other promises to you or give you any other things other than what we have agreed to?
THE DEFENDANT: No, sir.
Nowhere else in the colloquy did Villegas or his attorney indicate that he did not understand the proceedings. Based on its examination, the court found that Villegas "has freely and voluntarily tendered his plea with knowledge of the factual basis." After Villegas was sentenced, Immigration and Customs Enforcement issued a Notice of Intent to Issue a Final Administrative Removal Order, which provided that Villegas would be deported upon completing his sentence.
¶ 9 Villegas brought a postconviction motion requesting he be allowed to withdraw his plea. He maintained that the circuit court's plea colloquy was defective, he did not understand the colloquy and was pressured into signing the plea questionnaire, and his counsel rendered ineffective assistance leading up to the plea. The motion also sought reversal of the waiver into adult court on the grounds that the juvenile court erroneously exercised its discretion by waiving jurisdiction and that his counsel performed ineffectively in fighting the petition.
¶ 10 The circuit court ordered a hearing on the motion at which Villegas and Kennedy both testified. Kennedy testified he told Villegas that he could appeal the juvenile court's waiver determination, but the "chance of success [was] minimal." As a result, Villegas elected not to appeal the juvenile court's ruling. Kennedy also explained that Villegas never indicated he wished to appeal the juvenile court's decision after pleading guilty or even thought that was a possibility. When asked whether he had specifically informed Villegas that his guilty plea would waive his right to *256 appeal the juvenile court's waiver determination, Kennedy responded that he did not specifically address that point. Kennedy did, however, explain to Villegas that "a plea would waive virtually all rights he had."
¶ 11 Although unaware of Villegas' status as an illegal immigrant during the juvenile waiver hearing, Kennedy testified that he was well aware of that fact before the plea hearing and advised Villegas accordingly.
*204 Kennedy indicated that he spent about two hours going over the plea questionnaire, "explaining it to [Villegas] to make sure he fully understood it." The questionnaire contained the following section addressing the immigration consequences of his plea: "I understand that if I am not a citizen of the United States, my plea could result in deportation, the exclusion of admission to this country, or the denial of naturalization under federal law." Kennedy addressed this section with Villegas and "went over it again and again." Kennedy "pointed out to [Villegas] that it was very likely that he was going to be deported or very likely that his citizenship would be very badly damaged," including the "possibilities of citizenship." In terms of probability, Kennedy explained, "My advice to him was sort of in the 99 percentile range of being deported." In Kennedy's opinion, Villegas "understood" these consequences but "didn't want to face" them. Although Kennedy did not specifically discuss with Villegas whether he would be able to return to the United States after deportation, he "never said anything to [Villegas] to suggest that he might be able to come back."
¶ 12 Given the lack of "any real chance [Villegas] could stay in the United States," Kennedy explained that pleading guilty was part of a "strategy ... to minimize the damage to my client." Kennedy believed it would be "virtually impossible" to win at trial, *257 and going to trial "would probably do a great deal of harm by actually forcing the testimony of those victims and the children." Kennedy explained the relative chances of success to Villegas and "discussed it very thoroughly." A counteroffer to the State's plea offer was attempted, but when Kennedy suggested that Villegas might take his case to trial, the State called his "bluff."
¶ 13 Kennedy clarified that Villegas had no trouble understanding what was going on during the plea hearing, fully understood the consequences of his plea, and spoke English well. After going over the plea questionnaire "extensively," Kennedy averred that Villegas understood the court's colloquy "perfectly well," and any points of ambiguity in the colloquy had been addressed and clarified.
¶ 14 Villegas-now using an interpreter-told a very different story. Prior to his plea, Villegas claimed that Kennedy "didn't explain anything" and merely "read what was on the paper" and particularly failed to explain the immigration consequences.[3] He did admit that he knew deportation was a possibility but denied ever being told that deportation was "virtually ... certain." Even though he pled guilty, Villegas alleged that he "thought there was still a possibility" he would not be deported and "thought [he] could return to children's court by appealing." Villegas claimed that Kennedy had not talked to him about appealing the waiver. Villegas also accused the circuit court of failing to explain the immigration consequences of his plea. Villegas advised that he did not understand everything said during the plea hearing "because the words that *258 were used were hard to understand," and he felt he could not ask for clarification because he was "scared." Moreover, Kennedy never even told him he had a right to have a trial. He pled guilty, Villegas claimed, merely because he was told to "sign this paper or the judge will get mad."
¶ 15 Because of the Wisconsin Supreme Court's then-pending decisions in State v. Shata , 2015 WI 74, 364 Wis. 2d 63, 868 N.W.2d 93 *205 , and State v. Ortiz-Mondragon , 2015 WI 73, 364 Wis. 2d 1, 866 N.W.2d 717 -both addressing the scope of an attorney's duty to provide immigration advice-the postconviction court postponed ruling on the motion. After the Wisconsin Supreme Court decisions were released, the circuit court reconvened. The court recited the holdings of each decision, recounted the advice given by Kennedy that deportation was in the "ninety-ninth percentile range," and asked Villegas' postconviction counsel why Shata and Ortiz-Mondragon did not control the outcome of the motion. Villegas' counsel conceded that given the holdings of the two cases, "Kennedy was [not] ineffective in advising [Villegas] about ... his deportation consequences of his crime." Following this concession, the court did not address the argument further or make any specific findings of fact on the immigration-related issues.
¶ 16 The court then rejected the remainder of Villegas' arguments. It concluded that Villegas' valid guilty plea forfeited any nonjurisdictional challenge to the juvenile waiver hearing based on State v. Kraemer , 156 Wis. 2d 761, 457 N.W.2d 562 (Ct. App. 1990). As to Villegas' argument that Kennedy was ineffective for failing to advise him that his plea would forfeit any challenge to the juvenile waiver hearing, the court concluded that Kennedy was not ineffective. On this *259 point, the court specifically found that Kennedy discussed appealing the juvenile court's waiver determination, and Villegas voluntarily decided not to pursue the issue further. Villegas appeals this decision.
DISCUSSION
¶ 17 Villegas challenges both his plea and his waiver into adult court. As explained further below, the circuit court permissibly and correctly denied the motion to withdraw his plea. Since his plea suffers from no infirmities, he has waived any right to challenge his juvenile waiver proceeding, and his conviction is affirmed.
Plea Withdrawal Generally
¶ 18 A defendant who seeks to withdraw his or her plea after sentencing-as Villegas does here-must prove by clear and convincing evidence that withdrawal is necessary to correct a manifest injustice. State v. Bentley , 201 Wis. 2d 303, 548 N.W.2d 50 (1996) ; see also State v. Taylor , 2013 WI 34, ¶ 48, 347 Wis. 2d 30, 829 N.W.2d 482. Two routes are available.
¶ 19 First, he or she may argue that the plea is infirm under Bentley and Nelson v. State , 54 Wis. 2d 489, 195 N.W.2d 629 (1972), based upon "some factor extrinsic to the plea colloquy"-like ineffective assistance of counsel. Statev. Howell , 2007 WI 75, ¶ 74, 301 Wis. 2d 350, 734 N.W.2d 48. To succeed on this claim, the defendant must prove manifest injustice by clear and convincing evidence. See State v. Brown , 2006 WI 100, ¶ 42, 293 Wis. 2d 594, 716 N.W.2d 906.
*260 ¶ 20 Second, the defendant may establish a manifest injustice by showing the plea was not entered knowingly, intelligently, and voluntarily. Taylor , 347 Wis. 2d 30, ¶ 49, 829 N.W.2d 482. This showing requires the defendant to make a prima facie case that the plea colloquy failed to comply with WIS. STAT. § 971.08 (2015-16)[4] or other mandatory procedures. State v. Bangert , 131 Wis. 2d 246, 274, 389 N.W.2d 12 (1986). Section 971.08(1)(a) requires, *206 among other things, that circuit courts "[a]ddress the defendant personally and determine that the plea is made voluntarily with understanding of the nature of the charge and the potential punishment if convicted." Once the defendant demonstrates that the plea colloquy was inadequate (which should be apparent from the plea hearing transcript), the defendant has made a prima facie case and the burden shifts to the State to prove by clear and convincing evidence that the plea was nonetheless knowing, intelligent, and voluntary. Bangert , 131 Wis. 2d at 274-75, 389 N.W.2d 12 ; see also Howell , 301 Wis. 2d 350, ¶ 28, 734 N.W.2d 48 (explaining that any defect in the colloquy "should be clear from the transcript"). If the State fails to meet its burden, the defendant may withdraw the plea as a matter of right. See Bangert , 131 Wis. 2d at 274-75, 389 N.W.2d 12.
¶ 21 Villegas argues that he should be allowed to withdraw his plea on multiple grounds. He lodges a complaint under Bentley on the grounds that his counsel rendered ineffective assistance by failing to advise him of his ineligibility under DACA and that he would be permanently inadmissible to the United States. He further argues that counsel performed deficiently by *261 failing to warn him that pleading guilty would waive any ability to challenge his juvenile waiver proceeding. Finally, Villegas raises a claim under Bangert that his plea colloquy was defective, which made his plea unknowing, unintelligent, and involuntary.[5] We conclude that Villegas' claims fail, and he is not entitled to withdraw his plea.
Bentley Plea Withdrawal
¶ 22 Villegas claims that he pled guilty "out of ... mistaken belief that he would avoid deportation, preserve DACA eligibility and that avenues for lawful residence would remain." Villegas insists Kennedy performed deficiently in three ways: (1) failure to inform him that his plea would result in "clear, automatic, irreversible, and permanent inadmissibility" to the United States pursuant to 8 U.S.C. § 1182 (2012) ; (2) failure to advise him that his plea would render him ineligible for the federal government's DACA program; and (3) failure to inform him that his plea would forfeit any nonjurisdictional challenge to his juvenile waiver hearing. Villegas alleges that he would not have pled guilty had he been properly advised.[6] In our view, Kennedy rendered reasonably *207 effective assistance *262 with regard to the first two arguments, and even assuming deficiency, Villegas has failed to prove prejudice regarding his third argument.[7] Therefore, his Bentley challenge does not succeed. *263 ¶ 23 The Sixth Amendment of the United States Constitution and article I, section 7 of the Wisconsin Constitution guarantee criminal defendants the right to counsel. Shata , 364 Wis. 2d 63, ¶ 32, 868 N.W.2d 93. The United States Supreme Court and Wisconsin Supreme Court have held that this right to counsel also includes a guarantee of effective assistance of counsel. Strickland v. Washington , 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ; Shata , 364 Wis. 2d 63, ¶ 32, 868 N.W.2d 93. To demonstrate ineffective assistance that would justify his plea withdrawal, Villegas must prove that Kennedy performed deficiently, and those *264 deficiencies prejudiced his defense. Shata , 364 Wis. 2d 63, ¶ 33, 868 N.W.2d 93. Although we defer to any factual findings by the circuit court, "whether counsel's performance fell below the constitutional minimum is a question of law that we review independently." State v. Prescott , 2012 WI App 136, ¶ 10, 345 Wis. 2d 313, 825 N.W.2d 515.
¶ 24 Performance is deficient when the attorney's errors were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland , 466 U.S. at 687, 104 S.Ct. 2052. "Indeed, counsel's performance need not be perfect, nor even very good, to be constitutionally adequate." State v. Carter , 2010 WI 40, ¶ 22, 324 Wis. 2d 640, 782 N.W.2d 695. "The question is whether an attorney's representation *208 amounted to incompetence under 'prevailing professional norms.' " Harrington v. Richter , 562 U.S. 86, 105, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (quoting Strickland , 466 U.S. at 690, 104 S.Ct. 2052 ). To show prejudice, Villegas must show that "there is a reasonable probability" that, but for Kennedy's deficient performance, the result of the proceeding (the guilty plea) would have been different. Strickland , 466 U.S. at 694, 104 S.Ct. 2052.
¶ 25 Prior to the United States Supreme Court decision in Padilla v. Kentucky , 559 U.S. 356, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010), most courts held that defense counsel does not perform deficiently by failing to advise his or her client about the deportation consequences because those were collateral matters outside the scope of what the Sixth Amendment requires. See Shata , 364 Wis. 2d 63, ¶ 34, 868 N.W.2d 93 ("Prior to Padilla state courts and federal courts of appeals almost universally held that defense counsel's failure to advise a criminal defendant of possible immigration consequences of a conviction does not provide a basis for an ineffective assistance claim.");
*265 see also Padilla , 559 U.S. at 365 & n.9, 130 S.Ct. 1473 (collecting cases). In Padilla , however, the Supreme Court held that defense counsel does have a duty to correctly advise a defendant of the immigration consequences of his or her plea in certain limited circumstances. Id. at 368-69, 130 S.Ct. 1473.
¶ 26 The defendant in Padilla was advised incorrectly that he "did not have to worry about immigration status since he had been in the country so long." Padilla , 559 U.S. at 359, 130 S.Ct. 1473. In fact, the plea rendered him "eligible for deportation" such that deportation was "virtually mandatory." Id. at 359, 368, 130 S.Ct. 1473. The court concluded that this false advice constituted deficient performance. Id. at 368-69, 130 S.Ct. 1473. The court explained:
When the law is not succinct and straightforward ... a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences. But when the deportation consequence is truly clear, as it was in this case, the duty to give correct advice is equally clear.
Id. at 369.
¶ 27 Our own supreme court recently addressed "the scope of an attorney's duty to give advice regarding deportation" post- Padilla . Shata , 364 Wis. 2d 63, ¶ 41, 868 N.W.2d 93. In Shata , the defendant was charged with possession with intent to deliver marijuana-an offense that rendered him deportable upon conviction. Id. , ¶¶ 1, 59. Prior to entering a guilty plea, his attorney advised him that "he faced a 'strong chance' of deportation if convicted." Id. , ¶ 3. The defendant argued that, under Padilla , his attorney provided ineffective assistance by telling him "there was a 'strong chance' he would be deported when it was actually inevitable." Shata , 364 Wis. 2d 63, ¶ 53, 868 N.W.2d 93.
*266 ¶ 28 The court concluded that counsel did not perform deficiently. The court noted that the main problem in Padilla was that counsel's advice was incorrect. Shata , 364 Wis. 2d 63, ¶ 58, 868 N.W.2d 93. Because "[c]orrect advice is not deficient," the question was whether the advice given to Shata was correct. Id. , ¶¶ 58, 67. The court concluded that the advice given to the effect that there was a "strong chance" of deportation was "absolutely correct." Id. , ¶ 67. It further explained that requiring Shata's trial counsel to render advice that Shata absolutely would be deported upon pleading guilty "would be incorrect because a defense attorney does not control and cannot know with certainty whether *209 the federal government will deport an alien upon conviction." Id. , ¶ 71. Hence, Shata's attorney rendered reasonably competent assistance by informing him that his plea carried a strong chance of deportation. Id. , ¶ 79.
¶ 29 Given the complexity of immigration law, the court strongly cautioned against holding criminal attorneys to the same standard of subject matter expertise as immigration attorneys. Id. , ¶ 63.
The Padilla Court did not require that criminal defense lawyers function as immigration lawyers or be able to predict what the executive branch's immigration policies might be now or in the future.... [ Padilla ] noted that "[i]mmigration law can be complex, and it is a legal specialty of its own. Some members of the bar who represent clients facing criminal charges, in either state or federal court or both, may not be well versed in it." Accordingly, "the Court appears to acknowledge [that] thorough understanding of the intricacies of immigration law is not 'within the range of competence demanded of attorneys in criminal cases.' " "[R]easonably competent attorneys should know that it is not appropriate or responsible to hold *267 themselves out as authorities on a difficult and complicated subject matter with which they are not familiar," such as immigration law.
Shata , 364 Wis. 2d 63, ¶ 63, 868 N.W.2d 93 (citations omitted). Thus, the court rejected the defendant's claim that his attorney performed deficiently merely "by not reading the relevant immigration statutes." Id. , ¶ 75. He was advised that his plea carried a risk of deportation, and that was enough. Id.
¶ 30 The supreme court reasoned similarly in Ortiz-Mondragon . The defendant there also asserted he received ineffective assistance when counsel did not inform him of the certainty of deportation and exclusion from readmission. Ortiz-Mondragon , 364 Wis. 2d 1, ¶ 53, 866 N.W.2d 717. The court similarly rejected the notion that reasonably competent defense counsel can and should give this kind of advice where it is not certain. Id. , ¶ 61. The court pointed out the obvious problem that could arise by making such a bold prediction on immigration consequences that turns out to be wrong:
We note that incorrect advice that a plea will result in deportation or exclusion, like incorrect advice that a plea will not result in deportation or exclusion, could impact an alien defendant's decisionmaking. The former kind of misinformation might encourage a defendant to reject a beneficial plea offer and thereby subject him or herself to significantly more exposure. The latter kind of misinformation could cause a defendant to be surprised with the actual immigration consequences. Counsel should give accurate advice. Counsel should avoid overstating or understating the possible immigration consequences of a conviction. Ortiz-Mondragon's position, if adopted, would require more of an attorney than is required....
Id. , ¶ 62.
¶ 31 *268 Shata and Ortiz-Mondragon stand for the proposition that where the law is not "succinct, clear, and explicit," counsel is not deficient by accurately warning a client of the "risk of adverse immigration consequences." Ortiz-Mondragon , 364 Wis. 2d 1, ¶ 69, 866 N.W.2d 717 (quoting Padilla , 559 U.S. at 369, 130 S.Ct. 1473 ). Counsel need not read the tea leaves and attempt to predict what federal immigration authorities will do. Nor is counsel under any obligation to familiarize himself or herself with "what the executive branch's immigration policies might be now or in *210 the future." In view of these principles, Villegas' arguments crumble.
¶ 32 Villegas is incorrect that his attorney should have advised him that his guilty plea would necessarily result in "clear, automatic, irreversible, and permanent inadmissibility." To begin with, the proposition that Villegas would be permanently inadmissible to the United States as a result of his guilty plea appears to be incorrect as a matter of law. Villegas and the State agree that 8 U.S.C. § 1182 provides that Villegas will be inadmissible for a time based upon his conviction.[8] However, as the State points out, 8 U.S.C. § 1182(a)(2)(A)(i)(I) (2012) does not apply in the following situation:
[T]he crime was committed when the alien was under 18 years of age, and the crime was committed (and the alien released from any confinement to a prison or correctional institution imposed for the crime) more *269 than 5 years before the date of application for a visa or other documentation and the date of application for admission to the United States....
8 U.S.C. § 1182(a)(2)(A)(ii)(I) (2012). Thus, because Villegas committed armed robbery before he turned eighteen, it appears that he may be allowed to apply for "a visa or other documentation" five years after his release.
¶ 33 In his reply brief, Villegas does not dispute the State's argument, but rather retreats to a new fallback position: it is actually the five-year waiting period he should have been warned about.[9] The irony, of course, is that Villegas argued in his principal brief that any reasonably competent counsel would know the clear and obvious consequence of automatic permanent inadmissibility. But this new position is not any more defensible than his previous position. The fact that Villegas' appellate counsel was apparently incorrect illustrates why the Sixth Amendment's effective assistance of counsel guarantee does not demand much in the way of knowledge of immigration law: it can be complex and confusing, "a legal specialty of its own." Shata , 364 Wis. 2d 63, ¶ 63, 868 N.W.2d 93 (citation omitted).
¶ 34 Kennedy simply had no constitutional duty to give specific, direct advice on how pleading guilty would affect Villegas' possibilities for readmission beyond the accurate, generalized warnings that were given. The warnings did not tell Villegas with certainty what was to come; they were conditional. But they *270 were nevertheless correct. Deportation and its subsequent consequences depend in large part on prosecutorial discretion. The executive branch's exercise of prosecutorial discretion in determining who will be deported when is beyond the scope of specific advice the United States and Wisconsin Constitutions require criminal attorneys to give. Just as deportation depends at least in part on prosecutorial discretion and is therefore somewhat uncertain, a fortiori the possibility of readmission based on that conviction is also uncertain-not clear or automatic as Villegas insists. Villegas *211 could not be inadmissible until he was deported in the first place.
¶ 35 In stark contrast to the affirmatively false advice given in Padilla , Kennedy correctly warned Villegas that he might be denied readmission to the United States. Villegas admits-as Kennedy testified-that Kennedy went over the plea questionnaire "at length" with Villegas.[10] The questionnaire informed *271 Villegas that his guilty plea might result in "exclusion of admission" into the United States and "the denial of naturalization." The conditional warning that he might be excluded from the country was (as Shata holds) correct and sufficient, not incompetence under prevailing professional norms. Richter , 562 U.S. at 105, 131 S.Ct. 770.
¶ 36 We also reject Villegas' insistence that Kennedy performed deficiently by failing to acquaint himself with and give advice regarding the federal government's DACA policy. According to the Department of Homeland Security (DHS), DACA is a federal government policy concerning "the exercise of ... prosecutorial discretion" to ensure that "enforcement resources are not expended on ... low priority cases."[11] DHS has clarified that DACA is discretionary and "confers no substantive right, immigration status or pathway to citizenship."[12] Shata too characterized this particular program as an exercise of prosecutorial discretion by the executive branch that can be changed at any time. Shata , 364 Wis. 2d 63, ¶ 59 n.16, 868 N.W.2d 93. And Shata was abundantly clear that criminal attorneys need not "function as immigration lawyers or be able to predict what the executive branch's immigration policies might be now or in the future." Id. , ¶ 63. Therefore, we hold that Kennedy did not perform deficiently by failing to inform Villegas about DACA, a discretionary executive branch policy.
*272 ¶ 37 Villegas also argues he is entitled to withdraw his plea because Kennedy failed to advise him that his guilty plea would waive the opportunity to challenge the juvenile court's waiver determination. While the circuit court agreed Kennedy was unaware of the specific rule that pleading guilty would waive any challenge to the juvenile proceedings, the circuit court also made factual findings that Kennedy expressed his opinion that such an appeal had little chance of succeeding and that Villegas voluntarily elected not to appeal.
*212 ¶ 38 Even assuming Kennedy performed deficiently,[13] Villegas has not met his burden to prove prejudice. Villegas must show a different result is reasonably likely-i.e., there is a substantial, not just conceivable chance he would not have pled guilty had he received advice informing him that so pleading would waive the right to challenge his waiver into adult court. Richter , 562 U.S. at 111-12, 131 S.Ct. 770.
¶ 39 We think it highly improbable that Kennedy's alleged deficiency would have changed the calculus. Villegas had already elected to not challenge the *273 waiver proceedings.[14] We see no reason to think that learning he could not appeal the waiver would have significantly affected his decision to plea when he already decided he would not do so due to the less-than-promising chances of success. On the other side of the scale, Villegas obviously saw significant benefits to pleading guilty and accepting the State's offer. His four charges were reduced to one,[15] and he avoided what Kennedy thought would be extremely damaging testimony by his victims. This means his prison exposure was significantly reduced. Even more, he pled guilty knowing he faced a lengthy sentence, almost certain deportation, and diminished prospects of any future life here in the United States. While Villegas may wish to revise his strategy with the benefit of hindsight, he has not shown a reasonable probability he would not have pled guilty had he known doing so would extinguish his right to challenge his waiver into adult court. *274 ¶ 40 In sum, Villegas is not entitled to withdraw his plea because he has failed to show that he received ineffective assistance of counsel and to prove that he was prejudiced as a result. Kennedy correctly informed Villegas that pleading guilty could result in deportation and subsequent inadmissibility to the United States. This warning was a correct statement of the law and constitutionally adequate. Though Kennedy certainly could have researched the detailed immigration consequences, including *213 Villegas' eligibility for DACA, he was under no constitutional obligation to do so. Accordingly, we conclude that Kennedy's performance was not deficient. As to the allegation that Kennedy should have informed Villegas that the guilty plea would waive Villegas' ability to challenge the juvenile waiver decision, Villegas fails to show that he was prejudiced. Villegas considered appealing the order, was counseled that such an appeal would be fruitless, and elected not to appeal and instead plead guilty. We are not convinced that there is a reasonable probability that Villegas would have proceeded differently had he known that he could not appeal a decision he already decided not to appeal.
Bangert Plea Withdrawal
¶ 41 Villegas next argues that his guilty plea was taken in violation of his constitutional rights-i.e., it was not knowing, intelligent, and voluntary. He specifically maintains that the circuit court was under a duty to inform him that his guilty plea would waive any nonjurisdictional challenges to his conviction, including his claim that the waiver proceedings were defective. Villegas also generally avers that the court failed to conduct an adequate inquiry to ensure that he fully understood his guilty plea and gave it voluntarily.
*275 ¶ 42 We see no problem with the colloquy. The court explained the nature of the charge, the nature of the rights Villegas was giving up, and the potential punishment, including the possible immigration consequences. The court took its time to ensure that Villegas understood each question on the plea questionnaire, and it further allowed Kennedy to clarify two questions regarding the details of the actual plea agreement. After Kennedy's clarifications, Villegas indicated he understood these questions as well. Other than Villegas' conclusory assertion, we see nothing in the colloquy indicating the circuit court failed to make sure Villegas understood the nature of his plea. Villegas does not identify any other required procedure the circuit court failed to follow; nor does the transcript reveal that the court's colloquy did not comply with WIS. STAT. § 971.08. Additionally, Villegas offers no legal support or meaningful development for his contention that the court was required to go outside the substance of § 971.08 and the plea questionnaire and determine whether Villegas understood that he was specifically forfeiting his right to appeal the juvenile waiver decision. Thus, we need not address this argument. See State v. Pettit , 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).
¶ 43 In short, Villegas raises multiple claims that a manifest injustice has occurred entitling him to plea withdrawal. He has failed to make his case, and therefore, his plea remains valid.
Juvenile Waiver Hearing
¶ 44 Finally, Villegas mounts a full-scale attack against the juvenile court's decision to waive jurisdiction. He argues that the court erroneously exercised its *276 discretion by not considering the proper factors, and that Kennedy was ineffective for failing to conduct a full inquiry into his mental health and failing to discover that Villegas was an illegal immigrant before the waiver hearing. As explained below, we conclude that Villegas has forfeited both arguments by virtue of his valid guilty plea.
¶ 45 It is black letter law that "[a] valid guilty or no contest plea waives all nonjurisdictional defenses to a conviction, including constitutional violations." State v. Milanes , 2006 WI App 259, ¶ 13, 297 Wis. 2d 684, 727 N.W.2d 94. In Kraemer , 156 Wis. 2d at 764, 457 N.W.2d 562, we applied the guilty plea waiver rule to bar a *214 juvenile's claim that the juvenile court failed to consider the statutory criteria in making its decision. We rejected the juvenile's assertion that an error during the waiver proceedings was jurisdictional. Id. "Even if the juvenile court had failed to consider all the statutory waiver criteria ... it is an abuse of discretion." Id. Accordingly, we concluded that "the error claimed by Kraemer, if indeed it was error, is judicial, not jurisdictional." Id. Because the juvenile did not raise a jurisdictional error and did not challenge his plea, we concluded he forfeited the right to bring those claims before us. Id. at 767, 457 N.W.2d 562. We noted that the juvenile had voluntarily entered into a plea agreement that included terms beneficial to him. Id. at 765, 457 N.W.2d 562. "A defendant cannot follow one course of strategy at trial and then, if dissatisfied with the result, complain that he or she should be discharged or retried." Id.
¶ 46 Kraemer forecloses Villegas' challenge to the juvenile court's exercise of discretion. Even if he was correct that the court failed to consider the statutory *277 factors, Kraemer unequivocally holds that his valid guilty plea waived that challenge.[16]
¶ 47 For similar reasons, we also reject Villegas' challenge to the waiver hearing on the grounds that he received ineffective assistance of counsel during that hearing. We have referred to ineffective assistance of counsel as an "exception" to the guilty plea waiver rule. Milanes , 297 Wis. 2d 684, ¶¶ 12-13, 727 N.W.2d 94 ; see also State v. Kelty , 2006 WI 101, ¶ 43, 294 Wis. 2d 62, 716 N.W.2d 886. This "exception," however, is applied not as a general matter, but when the alleged ineffectiveness is put forward as grounds for plea withdrawal.[17] See Bentley , 201 Wis. 2d at 311, 548 N.W.2d 50. This is so because, as the United States Supreme Court has explained, a valid guilty plea "represents a break in the chain of events which has preceded it in the criminal process." Tollett v. Henderson , 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973). After *278 admitting guilt in open court, a defendant "may not thereafter raise independent claims relating to the deprivation of constitutional rights" outside of an attack on the plea itself. Id.[18] Thus, the "exception" to the guilty plea waiver rule does not provide an independent ground to challenge the effectiveness of counsel during preplea proceedings outside of an attack on the defendant's plea. A challenge to the juvenile waiver hearing based on counsel's ineffectiveness that is not raised as a Bentley plea withdrawal claim is subject to the *215 guilty plea waiver rule just like any other nonjurisdictional claim.[19] *279 ¶ 48 Turning to the application of the rule here, Villegas does not assert that Kennedy's alleged ineffectiveness during the waiver proceedings had anything to do with his later decision to plead guilty. See Bentley , 201 Wis. 2d at 315-16, 548 N.W.2d 50. Villegas does not even *280 request plea withdrawal on this ground. Rather, he implores us to overturn the juvenile court's waiver decision. Because Villegas does not raise a plea withdrawal claim under Bentley -i.e, that his counsel's ineffective assistance entitles him to withdraw his plea because, but for counsel's errors, he would not have pled guilty-it is, along with his other challenges to the juvenile waiver hearing, waived by virtue of his valid guilty plea.
CONCLUSION
¶ 49 Villegas launches a full-court press on all aspects of his criminal conviction.
*216 But he has not shown that he is entitled to withdraw his guilty plea. By choosing to plead guilty without demonstrating error, Villegas has waived the right to challenge the juvenile court's decision to waive jurisdiction into adult court. Accordingly, his challenges fail, and his conviction stands.
By the Court. -Judgment and order affirmed.

Villegas refers to himself as "Marcos" while the State uses "Rosas." We will refer to him simply as "Villegas."

One of the victims stated that two of the attackers had knives, while the accomplice stated that all three wielded knives.

This appears in tension with his subsequent testimony. Villegas admitted on cross-examination that his attorney "explain[ed] things" in the plea questionnaire when Villegas did not understand them.

All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

Villegas also argues that the "record supports" the conclusion that his plea was not knowing, intelligent, and voluntary "as a matter of constitutional fact." Villegas does not explain how we can resolve the conflicting testimony of Kennedy, who testified that Villegas understood the proceedings, and Villegas, who claimed he did not. However, this argument is undeveloped and we need not address it. See State v. Pettit , 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

Villegas reiterates multiple times and in multiple ways his initial argument that counsel failed to advise him that he would be deported, and he pled guilty on a "mistaken belief that he would avoid deportation." But he conceded the argument during the postconviction hearing and reiterates that concession by admitting in his brief that Kennedy "did not deficiently advise [him] about the deportation consequences" of his plea. Even if he had not already conceded the point, the argument lacks any semblance of merit. The postconviction court credited Kennedy's assertion that he told Villegas that deportation was very likely. Thus, Villegas was warned in no uncertain terms that he faced deportation as a result of his guilty plea. Further, any assertion that Kennedy was required to inform Villegas that deportation was a certainty (as opposed to very likely) is incorrect. As further explained below, even where the defendant is convicted of a deportable offense, deportation itself carries an element of prosecutorial discretion; deportation is never an absolute certainty. Kennedy correctly advised him that his plea could result in deportation.

A strong argument can be made that Villegas has conceded his entire argument regarding the immigration consequences of his plea. When asked by the circuit court whether State v. Shata , 2015 WI 74, 364 Wis. 2d 63, 868 N.W.2d 93, and State v. Ortiz-Mondragon , 2015 WI 73, 364 Wis. 2d 1, 866 N.W.2d 717, controlled, Villegas' postconviction counsel made the following concession:
I agree with the Court's summary of both Shata and Ortiz-Mondragon cases. I will say that under Shata , which I believe governs this case, Mr. Kennedy was not ineffective for advising [Villegas] that there was almost a certainty of his deportation, and I agree that Shata does not support my argument earlier that Mr. Kennedy was ineffective in advising [Villegas] about ... his deportation consequences of his crime.
I will still argue that the plea was not knowing, intelligent, or free for other reasons, not because of counsel's ineffectiveness at the plea level.
Counsel then proceeded to address the juvenile waiver hearing and counsel's ineffectiveness for not advising Villegas that he would forfeit the right to challenge the waiver by pleading guilty. The issue of immigration advice at the plea level was never mentioned again. The circuit court apparently found this to be a broad concession. It made no determination at all on any immigration-related consequences, and hence-other than crediting Kennedy's assertion that he told Villegas that deportation was very likely-it never explicitly found facts regarding what advice was actually given (i.e., whether to credit Villegas or Kennedy). The most reasonable reading of the record is that the postconviction court treated Villegas' concession as a concession of his ineffective assistance of counsel claims on all immigration matters.
Villegas' attorney now characterizes this as a concession only that Villegas was properly advised about the "deportation consequences," but not Villegas' arguments that he should have been advised he would be permanently inadmissible and ineligible for DACA. Villegas never explains why, if this is so, the issue was never addressed by the circuit court, no factual findings were made, and he never pressed the postconviction court for an actual decision on these issues. However, the State never mentions this concession. We also may in our discretion address unpreserved arguments. Because we need not resolve any of the factual disputes in order to do so, and in light of the fact that both parties address the claims substantively, we deem it prudent to address Villegas' arguments with regard to inadmissibility and DACA.

This statute provides that, subject to certain exceptions, "any alien convicted of ... a crime involving moral turpitude" is inadmissible to the United States. 8 U.S.C. § 1182(a)(2)(A)(i)(I). The parties agree that Villegas' criminal conviction qualifies as a crime of moral turpitude.

At the very least, Villegas does not argue the State's reading of the statute is wrong. Villegas acknowledges an "option to seek re-admission ... years after the immediate, automatic, [and] unavoidable consequence of inadmissibility." But he does not explicitly acknowledge his previous assertion that he would be permanently inadmissible.

This admission came after the postconviction hearings in a motion to reconsider. In a section entitled "Relevant facts of record," Villegas admitted that "Kennedy prepared [Villegas] for the plea hearing by going over the plea questionnaire at length." On appeal, Villegas makes no argument that Kennedy failed to inform him that his plea could potentially result in "exclusion of admission" into the United States and "the denial of naturalization," as laid out in the questionnaire. Rather, he claims that Kennedy should have specifically advised him that he was "automatically and immediately inadmissible" under 8 U.S.C. § 1182. Furthermore, even if Villegas denied being told by Kennedy that he might be inadmissible as a result of his conviction, he would have to explain how he was prejudiced. This information was in fact conveyed to him by the circuit court, which clearly and unequivocally (and correctly) warned him during the plea colloquy that his plea may result in "the exclusion from admission to this country or even denial of naturalization under federal law."

Memorandum of Secretary Janet Napalitano, United States Department of Homeland Security, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children , at 1 (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

Id. at 3.

Interestingly, Villegas argues on the one hand that his counsel was constitutionally deficient for failing to inform him pleading guilty eliminated the possibility of challenging his waiver determination. In the same brief, Villegas insists he did not forfeit the opportunity to challenge the juvenile court's waiver decision, and that the circuit court was wrong for so holding. If Villegas is right, and this is an unsettled proposition of law, then his counsel could not have been deficient for failing to know this and advise his client accordingly. See State v. Maloney , 2005 WI 74, ¶ 23, 281 Wis. 2d 595, 698 N.W.2d 583 (explaining that an attorney is not deficient for making an error in judgment on an unsettled proposition of law). In any event, as we detail below, Villegas' guilty plea did in fact forfeit his opportunity to challenge the waiver proceedings.

Although an order waiving juvenile jurisdiction is not appealable as of right, the order may be reviewed by filing a petition for leave to appeal under Wis. Stat. § 808.03(2). See State ex rel. A.E. v. Circuit Court for Green Lake Cty. , 94 Wis. 2d 98, 105a, 292 N.W.2d 114 (1980) (per curiam on reconsideration). Our supreme court has "emphasized the critical importance of an order waiving juvenile jurisdiction and the resultant need for prompt appellate review." Id. at 105c. Thus, granting a permissive appeal of a waiver decision "will often be necessary to protect the minor from 'substantial or irreparable injury'-one of the three criteria for granting permissive appeals under sec. 808.03(2)." Id. at 105d. Therefore, a petition for review of an order waiving juvenile jurisdiction should ordinarily be granted. See id.

Villegas originally faced up to sixty-four years and six months in prison. The armed robbery charge carried up to forty years, the burglary charge carried up to twelve years and six months, and the two false imprisonment charges carried up to six years each. By pleading guilty to the armed robbery charge, that exposure was reduced by twenty-four years and six months to a total of forty years.

Villegas responds to this by quibbling with whether the circuit court made enough factual findings or otherwise explained its similar ruling that State v. Kraemer , 156 Wis. 2d 761, 457 N.W.2d 562 (Ct. App. 1990), forecloses this challenge. Our review of such a question of law, however, is de novo. And Villegas never makes any real attempt to explain why Kraemer does not apply.

As explained above, the test for ineffective assistance of counsel claims requires a defendant to prove: (1) deficient performance, and (2) prejudice. Strickland v. Washington , 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prove prejudice in the context of a plea withdrawal, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial. State v. Bentley , 201 Wis. 2d 303, 312, 548 N.W.2d 50 (1996) (citing Hill v. Lockhart , 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (defendant must allege facts to show "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial" (citation omitted) ) ).

Our supreme court has cited this explanation with approval. See State v. Pohlhammer , 82 Wis. 2d 1, 3-4, 260 N.W.2d 678 (1978) (per curiam).

Numerous decisions from other jurisdictions support this conclusion. See, e.g. , United States v. Torres , 129 F.3d 710, 715-16 (2d Cir. 1997) (Tollett v. Henderson , 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973) barred ineffective assistance claim that did not relate to "the voluntary and intelligent character of the guilty plea"); United States v. Hartsfield, 160 F.Supp.3d 1315, 1318 (M.D. Fla. 2016), certificate of appealability denied (Sept. 28, 2016) (Tollett waiver rule "includes a claim of ineffective assistance of counsel based on a pre-plea event, including a claim of ineffective assistance of counsel"); Vasquez v. Parrott , 397 F.Supp.2d 452, 463 (S.D.N.Y. 2005) (applying Tollett to conclude that "[t]he petitioner's unconditional guilty plea waived all claims of ineffective assistance of counsel relating to events prior to the guilty plea that did not affect the voluntariness of his plea"); People v. Stovall , 284 P.3d 151, 154 (Colo. App. 2012), as modified on denial of reh'g (June 21, 2012) (citing Tollett , and holding that a guilty plea waives any argument that counsel was ineffective except to the extent it affects the knowing, intelligent, and voluntary character of the plea); State v. Schlemmer , 58 N.E.3d 573, 577 (Ohio Ct. App. 2016) (explaining that the waiver rule in Tollett applies equally to claims of ineffective assistance of counsel "except to the extent that the errors caused the plea to be less than knowing and voluntary") (citation omitted). Of particular note, the court in Jens v. Endicott , No. 2007-CV-617, slip op. at *3 (E.D. Wis. Feb. 12, 2009) applied Tollett to characterize a habeas petitioner's ineffective assistance claims as waivable "nonjurisdictional defects." It reasoned that these claims were waived because they "pertain[ed] to events prior to and unrelated to [petitioner's] guilty plea." Jens , slip op. at *3.
Other courts enunciate a similar application of the guilty plea waiver rule. See, e.g. , Wilson v. United States , 962 F.2d 996, 997 (11th Cir. 1992) (per curiam) (defendant's guilty plea waived ineffective assistance of counsel claim because it was "not about his decision to plead guilty"); Smith v. Estelle , 711 F.2d 677, 682 (5th Cir. 1983) (guilty plea waives ineffective assistance of counsel claims except those related to the knowing, intelligent, and voluntary character of the plea); Mincewicz v. Commissioner of Correction , 162 Conn.App. 109, 129 A.3d 791, 796 (Conn. App. Ct. 2015) ("[T]he entry of a guilty plea waives future ineffective assistance of counsel claims unless the ineffective assistance is so intertwined with the guilty plea that the plea cannot be considered knowing, voluntary, and intelligent."); Pine v. State , 788 S.W.2d 794, 795 (Mo. Ct. App. 1990) (explaining that, under state rules of criminal procedure, "all claims of ineffective assistance of counsel are waived except to the extent they make the plea involuntary"); People v. Lugg , 108 A.D.3d 1074, 1075, 968 N.Y.S.2d 785 (2013) (rejecting ineffective assistance claim because the defendant "failed to demonstrate that 'the plea bargaining process was infected by [the] allegedly ineffective assistance or that he entered the plea because of his attorney'[s] allegedly poor performance' ") (citation omitted; alterations in original); Whetsell v. State , 276 S.C. 295, 277 S.E.2d 891, 892 (1981) (holding that a knowing, intelligent, and voluntary guilty plea acts "as a waiver of all non-jurisdictional defects and defenses, including the claims of a violation of a constitutional right prior to the plea," and "applies to the claim that counsel was ineffective").