COURT OF APPEALS
DECISION
DATED AND FILED

December 27, 2019

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2018AP1423-CR**

Cir. Ct. No. 2007CF5531

**STATE OF WISCONSIN**

**IN COURT OF APPEALS**
**DISTRICT I**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

   V.

PHENG YANG,

   DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Milwaukee County:  PATRICIA D. McMAHON and JEFFREY A. CONEN, Judges. *Affirmed*.

Before Brash, P.J., Kloppenburg and Dugan, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.  Pheng Yang appeals from a judgment, entered on his guilty plea, convicting him on one count of second-degree intentional homicide.  He also appeals from an order denying his postconviction motion for plea withdrawal.  Yang claims that:  (1) his plea was not knowing, intelligent, and voluntary because he did not understand he was admitting an intent to kill; and (2) trial counsel was ineffective for not properly explaining the impact of the plea and for not requesting additional time with Yang before he entered the plea.  We agree with the circuit court[1] that the record reflects a valid plea and no ineffective assistance; thus, the circuit court did not err in denying the motion without a hearing.  We affirm.

## BACKGROUND

¶2    Yang and his wife, Bao Vang,[2] were having relationship issues after Vang supposedly left Yang for someone she met on the internet.  On November 9, 2007, around 1:00 p.m., Vang and her cousin, Lee Xiong, went to Yang's auto shop so Vang could pick up a check from Yang.  Xiong waited outside.  Yang's cousin, Kao Yang ("Kao"), appeared after about ten minutes and told Xiong to leave because Yang would take Vang to cash the check.  Yang then came out and told Xiong he would bring Vang home after cashing the check; Xiong observed what she believed to be blood on Yang's work shirt and cheek.  She continued to

---

[1] The Honorable Patricia D. McMahon accepted Yang's plea and imposed sentence; we will refer to her as the trial court.  The Honorable Jeffrey A. Conen denied the postconviction motion; we will refer to him as the circuit court.

[2] Yang and Vang were not married under Wisconsin law, but considered themselves married and had children together.

wait for Vang, entering the shop when a customer arrived. Someone told her Yang had just left with Vang.

¶3 Xiong went to Vang's home to look for her; Vang was not there. Xiong returned to the auto shop; Yang told her that Vang had jumped out of his car. Around 5:00 or 6:00 p.m., Xiong reported Vang missing. While Xiong was with police, Yang called her, telling her that Vang frequently ran away when they argued.

¶4 Police investigated at Yang's home. Through the window of a car parked on the property, officers observed a roll of black garbage bags and a pair of pants that appeared to be blood-stained. Yang said the car belonged to his nephew. An officer contacted the nephew, who agreed to come open the car for police to search. When Yang learned his nephew was coming, he said, "Just arrest me." When a detective asked why, Yang answered, "I killed my wife, she's in the trunk of the car." Yang was arrested. As he was being patted down, he told officers he had a "good reason" for killing Vang. The car's trunk was opened, and Vang's body was found rolled up in a tarp. The medical examiner determined the cause of death was blunt force injury to the head and neck.

¶5 Police interviewed Yang's nephew, who initially denied any knowledge of what happened to Vang. Eventually, he admitted that he heard Vang inside Yang's shop, screaming as if in pain. When he walked past the open office door, he saw Yang standing over Vang, striking her with a mallet between the shoulder blades. Yang then closed the office door, and his nephew heard five or six more blows. Later, Yang exited the office with blood on his hands and went to wash up. The nephew then heard Yang tell Kao to go outside and speak to Xiong. The nephew also saw Yang mopping the office floor.

¶6   Kao admitted helping Yang clean up and helping to transport Vang's body to the car. After being read his rights, Kao told police that Yang knew Vang was coming to the shop and Yang was going to "beat her down" if she came alone.

¶7   Yang told police that Vang had come at him with a hammer, striking him three times. He then went to where the tools were kept, grabbed a mallet, and struck Yang in the back of her head. He said that her cheating on him started the incident. When Yang was interviewed later, he said that he was angry because Vang did not want to get back together with him. She began to run away. She tried to reach a hammer but could not reach it. She ran into the office. He grabbed a mallet. She swung her purse at him, and he struck her in the head. He asked his cousin to help him dispose of the body. Yang was charged with one count of first-degree intentional homicide and one count of hiding a corpse.

¶8   Yang, who is Hmong, had an interpreter for all court proceedings, although he does know some English. At a pretrial conference, he raised the possibility of a not guilty by reason of mental disease or defect (NGI) plea. At a later hearing, Yang's attorney raised competency concerns and requested another NGI evaluation. The trial court ordered various examinations, including an inpatient commitment for evaluation at the examiners' request. Ultimately, and after a diagnosis of malingering, Yang was deemed competent to proceed, and at least two evaluators determined that there was no support for an NGI plea.

¶9   In December 2008, Yang's retained attorney withdrew, and successor counsel was appointed. In February 2009, Yang entered a plea. Pursuant to a plea agreement, in exchange for Yang's guilty plea, the State would amend the homicide charge to second-degree intentional homicide and agreed to dismiss and read in the charge of hiding a corpse. The trial court accepted Yang's

plea and sentenced him to thirty-five years of initial confinement and fifteen years of extended supervision.

¶10 Yang's appellate rights lapsed but were reinstated. Original appellate counsel filed a no-merit report, which this court rejected. Successor appellate counsel was appointed and eventually filed a postconviction motion seeking plea withdrawal. The motion alleged that Yang's plea "was involuntarily made and represents a manifest injustice" because of "a continuing indication of uncertainty on his part as well as on the part of the interpreter[.]" Yang also claimed not to have fully understood the "true impact" of a plea because his trial counsel did not tell him that "he was acknowledging the intent to kill"[3] or that he was "forever waiving the right to claim that the 'not being in the right mind' could be presented at trial as a basis to seek a further lesser included conviction." The motion further asserted that trial counsel was ineffective for not informing Yang "that by entering a plea he was in fact admitting that he intended to kill his wife and that he was waiving any claim that he acted in self defense … [or] that he may have acted recklessly" and for not taking additional time to ensure his understanding. In an affidavit supporting the motion, Yang asserted that he "would never [have] pled if he had known that he was admitting that he intended to kill his wife."

¶11 The circuit court noted that the trial court had reviewed the elements of second-degree intentional homicide with Yang during the plea colloquy and had

---

[3] To prove second-degree intentional homicide, the State must show that the defendant caused the death of the victim and that the defendant acted with the intent to kill the victim. *See* WIS JI—CRIMINAL 1050. "'Intent to kill' means that the defendant had the mental purpose to take the life of another human being or was aware that (his) [or] (her) conduct was practically certain to cause the death of another human being. *See id.*

5

"fully explained the meaning of 'intent to kill' in the context of what occurred." That is, while Yang was claiming that trial counsel had not reviewed the elements with him, "the record demonstrated unequivocally that *the court* fully explained the elements" and that Yang understood the impact of his plea. The circuit court determined that Yang's claim that he would not have pled guilty was completely conclusory: Yang had not explained why, if trial counsel had better explained the elements of second-degree intentional homicide, he would have rejected the plea deal and gone to trial on the first-degree intentional homicide charge instead. Thus, the circuit court denied the motion without a hearing. Yang appeals.

**DISCUSSION**

*I. Standards of Review*

¶12    A defendant who seeks to withdraw his or her plea after sentencing must demonstrate, by clear and convincing evidence, that withdrawal is necessary to correct a manifest injustice. *See* ***State v. Sulla***, 2016 WI 46, ¶24, 369 Wis. 2d 225, 880 N.W.2d 659. One way to show a manifest injustice is by showing the plea was not knowingly, intelligently, or voluntarily entered. *See* ***id.***

¶13    There are two legal paths to challenging the knowing, intelligent, and voluntary nature of a plea. *See* ***id.*** The first is with a motion under ***State v. Bangert***, 131 Wis. 2d 246, 389 N.W.2d 12 (1986), invoked when the plea colloquy is allegedly defective because the trial court failed to comply with a mandatory duty. *See* ***id.*** at 274. The second is with a motion under ***Nelson v. State***, 54 Wis. 2d 489, 95 N.W.2d 629 (1972), and ***State v. Bentley***, 201 Wis. 2d 303, 548 N.W.2d 50 (1996), alleging that some factor extrinsic to the plea colloquy made the plea invalid. *See* ***Sulla***, 369 Wis. 2d 225, ¶25. Ineffective assistance of counsel is one type of extrinsic factor. *See* ***id.***

6

¶14    Here, Yang's postconviction motion was a ***Nelson/Bentley*** motion, alleging that factors extrinsic to the plea colloquy—a confused interpreter and ineffective trial counsel—prevented a knowing, intelligent, and voluntary plea. While Yang makes a ***Bangert*** claim on appeal that the trial court failed to "assess his capacity to understand" the issues at the colloquy, he did not raise any ***Bangert*** issues in his postconviction motion. We need not consider issues raised for the first time on appeal. *See **State v. Van Camp***, 213 Wis. 2d 131, 144, 569 N.W.2d 577 (1997).

¶15    A ***Nelson/Bentley*** postconviction motion must allege "sufficient material facts that, if true, would entitle the defendant to relief." *See **State v. Allen***, 2004 WI 106, ¶9, 274 Wis. 2d 568, 682 N.W.2d 433; ***Bentley***, 201 Wis. 2d at 310. A sufficient motion entitles a defendant to a hearing, but if the motion fails to allege sufficient facts or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief, then the circuit court has the discretion to grant or deny a hearing. *See **Allen***, 274 Wis. 2d 568, ¶9. On appeal, we review the allegations within the four corners of the motion itself for sufficiency, not the arguments in the appellate brief. *See **id.***, ¶27.

*II. The Interpreter*

¶16    Yang's postconviction motion first asserted "there was a continuing indication of uncertainty on his part as well as on the part of the interpreter[.]"[4] On appeal, he claims the interpreter "was having difficulty with the proceedings."

---

[4] At least two interpreters appeared in this case. Yang does not specifically identify which interpreter had the problem, although we presume he is complaining about only the interpreter at his plea hearing.

Implicitly, Yang claims that the "difficulty" and "uncertainty" prevented him from understanding the nature of the charges and, specifically, the intent to kill element.

¶17    Selection of an interpreter is left to the trial court's discretion. *See State v. Besso*, 72 Wis. 2d 335, 343, 240 N.W.2d 895 (1976). "On review, the burden is on the appellant to show that the interpreter was in any way deficient." *See id.* However, Yang does not challenge the interpreter's qualifications, identify any erroneous interpretation, or contend that the interpreter "misstated or inadequately explained any of the concepts that a defendant must understand in order to make a plea of guilty." *See id.* The single record citation in the postconviction motion, to "plea transcript 10-24," is too conclusory to identify any actionable error by the interpreter that would warrant an evidentiary hearing.[5]

### III. Elements of the Offense

¶18    In his affidavit supporting the postconviction motion, Yang claimed he "did not intend to kill his wife … and would never [have] pled if he had known that he was admitting that he intended to kill his wife." The postconviction motion alleged his plea was involuntary because "he was not informed by his trial attorney that he was acknowledging the intent to kill" and he did not know "he was forever waiving his right to claim that the 'not being in the right mind' could be presented at trial as a basis to seek a further lesser included conviction."

---

[5] In the cited fifteen-page portion of the twenty-seven-page plea hearing transcript, the interpreter interrupted the trial court three times: once to request a definition of "mitigate," once when the interpreter needed the trial court to repeat a portion of the deportation warning, and once to ask the trial court to repeat a question. We agree with the State's analysis that, in the proper context of the entire colloquy, these three interruptions do not demonstrate that the interpreter was having difficulty but, rather, that he was "faithfully discharging his duty to accurately translate information between the [trial] court and Yang."

Relatedly, Yang alleged that "trial counsel was ineffective by not informing Mr. Yang that by entering a plea he was in effect admitting that he intended to kill his wife and that he was waiving any claim that he acted in self-defense." He also claimed that trial counsel should have requested additional time to ensure he understood the elements and the defenses he was waiving.

## A. The Plea Colloquy

¶19    The record conclusively demonstrates that Yang had been fully advised of the elements of his offense and that Yang acknowledged his understanding of those elements, including intent to kill. At the outset of the plea hearing, trial counsel detailed her discussions with Yang about the elements. She explained he was "taking responsibility for causing" Vang's death and that his actions were intentional because he believed that he needed to defend himself, although he now realized those actions were not necessary. Trial counsel also said she had twice reviewed the jury instruction with Yang with the assistance of the interpreters—once the day before the plea and once the day of the plea. Yang acknowledged reviewing the instruction with trial counsel.

¶20    The trial court then engaged Yang in an extensive plea colloquy. It first summarized the second-degree intentional homicide charge, including that Yang caused Vang's death "with intent to kill [her] under circumstances which mitigated [or reduced] … the offense of first-degree intentional homicide." Yang said he understood. Further into the colloquy, the trial court began a more detailed discussion of the charge. It noted that "what you are telling me by pleading guilty is that you caused the death" of Vang, then asked Yang, "[I]s that what happened, you caused her death?" Yang answered, "Yes."

¶21 The trial court specifically reviewed the "acted with intent to kill" element with Yang, telling him that "intent to kill means that you had the purpose to kill or you were aware that your conduct was practically certain to cause" Vang's death. Yang consulted trial counsel off the record. The trial court then explained, "[Y]ou were hitting [Vang] in the head with a mallet, and certainly that is something that can cause a person's death, correct?" Yang consulted trial counsel again before answering, "Yes."

¶22 The trial court's explanation of "intent to kill" tracked the statutory definition of "with intent," which "means that the actor either has a purpose to do the thing or cause the result specified, or is aware that his or her conduct is practically certain to cause that result." *See* WIS. STAT. § 939.23(4) (2007-08). Thus, even if Yang did not actually "ha[ve] a purpose" to kill Vang, he still acknowledged having the requisite intent because he was aware that striking Vang's head with a mallet was practically certain to cause her death.

¶23 With respect to possible defenses,[6] trial counsel noted that she had reviewed the two doctor reports regarding an NGI plea with Yang; both doctors believed that Yang "was not in a mental state that would preclude criminal responsibility." Yang agreed with the trial court's summary that, while at the time Yang thought he was acting to defend himself, that was not a reasonable belief and the force he used was not reasonable. Yang's trial counsel then reiterated that she had discussed with Yang, in what she "believed to be a correct lay explanation," the reasonableness of his use of force. Yang agreed with the explanation trial

---

[6] In the postconviction motion, Yang claimed that he did not know that he was giving up a defense of "not being in the right mind." It is not clear if Yang is referring to an NGI plea—which was unsupported by the doctors who evaluated him—or a self-defense claim.

counsel provided, and the postconviction motion does not allege that trial counsel provided any incorrect explanations. The trial court then explained to Yang that, according to the doctors, Yang's condition did not meet the definition of a mental disease or defect that would excuse his conduct. Yang acknowledged this. Thus, the record reflects Yang entered a knowing, intelligent, and voluntary plea.

## B. Trial Counsel's Performance

¶24 To demonstrate ineffective assistance of trial counsel—and, thus, a manifest injustice arising therefrom—Yang must show that trial counsel's performance was deficient and that the deficiency prejudiced the defense. *See State v. Dillard*, 2014 WI 123, ¶¶84-85, 358 Wis. 2d 543, 859 N.W.2d 44. Deficient performance occurs when the attorney's errors are so serious that he or she was not functioning as the counsel guaranteed by the constitution. *See State v. Villegas*, 2018 WI App 9, ¶24, 380 Wis. 2d 246, 908 N.W.2d 198. To prove prejudice, Yang must show a reasonable probability that, but for trial counsel's deficiency, the result of the plea would have been different. *See id.* However, it is not enough for Yang to allege that he would have pled differently. He must also support that allegation with objective, factual assertions that allow the reviewing court to meaningfully assess the claim. *See Bentley*, 201 Wis. 2d at 313-14.

¶25 Yang claims that trial counsel did not inform him that, with his plea, he was admitting he intended to kill Vang or that he was giving up any defenses, and trial counsel should have sought more time to ensure he understood these effects of his plea. These assertions are conclusory and refuted by the record. *See Allen*, 274 Wis. 2d 568, ¶9. As noted above, trial counsel explained her efforts in reviewing the elements of the offense with Yang and the time she had spent with him. Trial counsel had two long meetings with Yang, facilitated by an interpreter,

11

and she reviewed the competency evaluations and the criminal responsibility evaluations with Yang. Trial counsel also noted the assistance of one of the interpreters, who had "been available to me literally at the moment of the call" and who translated Yang's written documents.

¶26 As noted, trial counsel explained that she and Yang had twice reviewed the jury instruction for second-degree intentional homicide. She told the court how she explained the elements of second-degree intentional homicide to Yang, stating that "his actions at the time were intentional because he believed that he needed to take those actions to defend himself, but that he was wrong." Yang agreed they had reviewed the jury instruction and that trial counsel had explained the elements to him.

¶27 The trial court questioned Yang about the elements of second-degree intentional homicide, including the unreasonableness of his beliefs and the force he used, and about his intent to kill Vang. Yang agreed that trial counsel had reviewed the jury instruction and the elements of the crime with him and agreed that counsel had "spent a lot of time trying to explain the legal concepts into lay language so [Yang] could understand them."

¶28 Yang does not dispute—at the plea hearing, the postconviction motion, or on appeal—trial counsel's detailed description of the extensive discussions she had with him or the assistance that the interpreters provided to facilitate communications before the plea. He also does not allege how, in light of such a record, additional time with trial counsel would have changed the result. Thus, Yang has not adequately alleged that trial counsel's conduct was deficient.

¶29 While Yang claims that trial counsel's deficiencies prejudiced him because he "lost his right to be tried as to the intent issue or argue for lesser

included instruction" by presenting his "right mind" defense, he makes no allegations about why he would have opted for trial on first-degree intentional homicide and tried to convince a jury to convict him of a lesser-included offense when he was given the opportunity to plead to a lesser-included offense. Yang also does not allege why he would have rejected a plea deal and opted for trial if he had a better understanding that he was waiving any defenses, especially when the evidence of record does not support an NGI plea. Thus, Yang has also failed to sufficiently allege any prejudice.[7]

## IV. Conclusion

¶30    The circuit court properly denied Yang's postconviction motion without an evidentiary hearing.[8] The allegations about trial counsel's assistance are conclusory and, in any event, the record conclusively demonstrates that Yang entered a knowing, intelligent, and voluntary plea.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[7] Yang's other allegations of ineffective trial counsel include that: (1) counsel "instructed him to just agree with the Judge when he didn't know what to say and did not understand what was being agreed to"; (2) he told his attorney that Vang attacked him "in a most aggressive manner while using the hammer as a weapon" and that he acted "for the sole purpose of terminating her assault"; (3) trial counsel told him he had to take the plea deal; and (4) trial counsel did not take adequate time to meet with him. These claims are wholly conclusory.

[8] Yang complains that "[h]ad a full hearing been allowed, a full record would have been before the Court and would have enabled the Court to meaningfully consider whether counsel's conduct was deficient and whether this prejudiced" him. However, "the facts supporting plea withdrawal must be alleged in the petition and the defendant cannot rely on conclusory allegations, hoping to supplement them at a hearing." *See* **State v. Bentley**, 201 Wis. 2d 303, 313, 548 N.W.2d 50 (1996).